IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| JAMES ALLEN FRYE, on Behalf of Himself and All Others Similarly Situated., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 07-2708 |
| BAPTIST MEMORIAL HOSPITAL, INC. d/b/a BAPTIST MEMORIAL HOSPITAL—MEMPHIS, BAPTIST MEMORIAL HOSPITAL—COLIERVILLE, and BAPTIST MEMORIAL HOSPITAL FOR WOMEN | ) ) ) ) ) ) ) | |
| Defendant. | ) ) ) | |

## ORDER GRANTING MOTION TO DECERTIFY COLLECTIVE ACTION

Before the Court is Defendant Baptist Memorial Hospital, Inc.'s ("Baptist") Motion to Decertify Collective Action, filed January 15, 2010. (See ECF No. 339.)  On behalf of himself and other similarly situated employees, Plaintiff James Allen Frye responded in opposition on April 9, 2010.  (See ECF No. 373.) Baptist replied on June 3, 2010.  (See ECF No. 387.)  For the following reasons, the Court GRANTS Defendant's Motion to Decertify Collective Action.

**I. Background**

This case arises from the claims of Plaintiff James Allen Frye ("Frye"), a former employee of Baptist. Baptist operates three acute care hospitals in Tennessee: Baptist Memorial Hospital-Memphis ("BMH-Memphis"), Baptist Memorial Hospital-Collierville ("BMH-Collierville"), and Baptist Memorial Hospital for Women ("BMHW"). (See Wolfe Decl. ¶¶ 6, 15, ECF No. 340-2.) From 2004 until his termination on April 19, 2007, Frye worked as a nurse at BMH-Memphis. (Barbaree Decl. ¶ 4, ECF No. 340-1)

Baptist requires its hourly employees to take daily, uncompensated meal breaks. (See Baptist Policy Manual, Pl.'s Resp. Ex. I, ECF No. 373-9.) ("Baptist Policy Manual") To account for those breaks, Baptist's payroll system automatically deducts from each hourly employee's paycheck an amount representing the time the employee received for meal breaks.[1] (Ingram Dep. 29:7-29:9, Mar. 23, 2010, ECF No. 373-5.) The meal break policy governs all three Baptist hospitals. (Id.) If an employee experiences any work-related interruption during a meal break, no matter how brief, the employee must receive a subsequent, uninterrupted meal break or be paid as if she had

---

[1] This Order refers to this policy interchangeably as the "automatic deduction policy" or "meal break policy."

worked through the entire meal break.[2]   (See Banta Dep. 40:16-41:17, Mar. 22, 2010, ECF No. 373-2; Baptist Policy Manual.)

Although its automatic deduction policy applies system-wide, Baptist has not adopted a system-wide policy allowing employees to cancel the automatic deduction when they experience interrupted or missed meal breaks.   Baptist prefers that employees note interrupted or missed meal breaks in an "exception log." (Garrison Dep. 58:1-58:25, Mar. 22, 2010, ECF No. 373-1; Johnson Dep. 16:1-17:20, Mar. 23, 2010, ECF No. 373-3.)   Despite this preference, Baptist acknowledges that some departments use less formal procedures, like passing "sticky note[s]" from employees to supervisors.   (Johnson Dep. 16:11-16:19, Mar. 23, 2010.)   Whether through a formal exception log or an informal process, however, each hourly employee must report missed or interrupted meal breaks to Baptist to ensure she receives proper compensation.[3]   (Garrison Dep. 23:20-23:22.)

Frye alleges that Baptist violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 et seq., by failing to compensate him and other similarly situated hourly employees properly for

---

[2] Many Baptist employees are required to take 30-minute meal breaks.  If, 15 minutes into her lunch, an employee is interrupted for 3 minutes for work-related obligations and does not receive a subsequent, uninterrupted 30-minute meal break, Baptist policy requires that she be paid as if she had worked throughout her 30-minute meal break.  The automatic deduction for her 30-minute meal break must be cancelled for the day in question.  (See Johnson Dep. 15:1-15:19, Mar. 23, 2010, ECF No. 373-3.)

[3] This Order refers to the requirement that Baptist employees take some affirmative action to cancel or reverse the automatic deduction for meal breaks as the "exception policy" or "exception procedures."

all time worked. According to Frye, "through its automatic deduction policy and the implementation of that policy, [Baptist] has not paid employees for missed or interrupted meal breaks at all three of its facilities . . . ." (See Resp. to Def.'s Mot. to Decertify Collective Action 1, ECF No. 373.) ("Pl.'s Resp.")

By Order dated September 16, 2008, the Court granted conditional certification of a proposed class of employees who were subject to an automatic 30-minute payroll deduction for lunch breaks. (See Order Granting in Part and Denying in Part Mot. to Certify Collective Action, ECF No. 144.) Following discovery, Baptist filed the Motion to Decertify currently before the Court. (See ECF No. 339.)

**II. Standard of Review**

Section 216(b) of the FLSA permits employees to recover unpaid compensation by collectively suing an employer under certain circumstances. See 29 U.S.C. § 216(b). That subsection states, in pertinent part:

> Any employer who violates [the maximum hours provisions] of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be . . . . An action to recover [for such liability] may be maintained against any employer . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such

4

> consent is filed in the court in which the action is
> brought.

29 U.S.C. § 216(b) (emphasis added).  To proceed collectively,
named plaintiffs must therefore demonstrate that they are
"similarly situated" to the opt-in plaintiffs -- the employees
they seek to notify and represent.[4]

To determine whether plaintiffs are similarly situated,
courts generally employ a two-stage inquiry.  Comer v. Wal-Mart
Stores, Inc., 454 F.3d 544, 546 (6th Cir. 2006).  The first
stage occurs at the beginning of discovery, and "[t]he second
occurs after 'all of the opt-in forms have been received and
discovery has concluded.'"  Id. (quoting Goldman v. RadioShack
Corp., No. 2:03-CV-0032, 2003 WL 21250571, at *6 (E.D. Pa. Apr.
17, 2003)).

At the first stage, courts apply a "fairly lenient"
standard to determine whether plaintiffs are similarly situated,
relying on the pleadings and any filed affidavits.  See Pacheco
v. Boar's Head Provisions Co., Inc., 671 F. Supp. 2d 957, 959
(W.D. Mich. 2009).  Named plaintiffs must make only a "modest
factual showing" of class-wide discrimination.  Comer, 454 F.3d
at 546.  If a court finds the potential opt-in plaintiffs

---

[4] In a collective action, employees suing on their own behalf are referred to
as "named" or "lead" plaintiffs.  Employees represented by the named
plaintiffs are called as "opt-in" plaintiffs, because they must provide
written consent to join the action, see 29 U.S.C. § 216(b).  Unlike class
members in a class action under Rule 23 of the Federal Rules of Civil
Procedure, however, opt-in plaintiffs are party plaintiffs.  See O'Brien v.
Ed Donnelly Enters., 575 F.3d 567, 584 (6th Cir. 2009).

similarly situated to the named plaintiffs, the court conditionally certifies the class, and potential plaintiffs are provided notice and an opportunity to join the action.   Id. Although courts typically grant conditional certification, that certification is "by no means final."   Id.

A "stricter standard" applies at the second stage.   See id. The burden of showing that the opt-in plaintiffs are similarly situated remains on the named plaintiffs.   O'Brien v. Ed Donnelly Enters., 575 F.3d 567, 584 (6th Cir. 2009).   However, because the second stage follows discovery,[5] courts "examine more closely the question of whether particular members of the class are, in fact, similarly situated."   Comer, 454 F.3d at 547; White v. MPW Indus. Servs., 236 F.R.D. 363, 366 (E.D. Tenn. 2006) (explaining that, because a court has much more information on which to base its decision, the court "makes a factual determination on the similarly situated question") (internal quotations omitted).   To avoid decertification, the named plaintiffs must introduce "substantial evidence" that the opt-in plaintiffs are similarly situated.   Price v. Acosta, Inc., No. 03-2686, slip op. at 7 (W.D. Tenn. Feb. 19, 2008); see also Crawford v. Lexington-Fayette Urban Cnty. Gov't, No. 06-299-JBC, 2008 WL 2885230, at *5 (E.D. Ky. July 22, 2008).

_____
[5] Technically, the defendant's motion for decertification triggers the second stage.  For that reason, many courts refer to the second stage as the "decertification stage." See, e.g., Wilks v. Pep Boys, No. 3:02-0837, 2006 WL 2821700, at *2 (M.D. Tenn. Sept. 26, 2006).

Although elevated at the second stage, the "similarly situated" requirement is less stringent than the requirement that common questions predominate in certifying class actions under Rule 23 of the Federal Rules of Civil Procedure. O'Brien, 575 F.3d at 584 (citing Grayson v. K Mart Corp., 79 F.3d 1086, 1095-96 (11th Cir. 1996)); see Fed. R. Civ. P. 23. The plaintiffs need not be identically situated. Wilks v. Pep Boys, No. 3:02-0837, 2006 WL 2821700, at *3 (M.D. Tenn. Sept. 26, 2006). Rather, the question is simply whether the differences among the plaintiffs outweigh the similarities of the practices to which they were allegedly subjected. See id.

If the plaintiffs are similarly situated, the action proceeds collectively. See Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1218 (11th Cir.2001). "If the claimants are not similarly situated," however, the "court decertifies the class, and the opt-in plaintiffs are dismissed without prejudice. The class representatives – i.e. the original plaintiffs – proceed to trial on their individual claims." Id. (quoting Mooney v. Aramco Servs. Co., 54 F.3d 1207, 1213-14 (5th Cir. 1995), abrogated in part on other grounds by Desert Palace Inc., v. Costa, 539 U.S. 90 (2003) (internal quotation marks omitted)); see Alvarez v. City of Chicago, 605 F.3d 445, 450 (7th Cir. 2010) (holding that "[w]hen a collective action is decertified, it reverts to one or more individual actions on behalf of the

7

named plaintiffs"); <u>Sandoz v. Cingular Wireless LLC</u>, 553 F.3d 913, 916 n.2 (5th Cir. 2008) (explaining that, if plaintiffs are not similarly situated, the court "must dismiss the opt-in employees, leaving only the named plaintiff's original claims"); cf. <u>O'Brien</u>, 575 F.3d at 573 (affirming dismissal of the opt-in plaintiffs and noting that most later filed individual actions); <u>Fox v. Tyson Foods, Inc.,</u> 519 F.3d 1298, 1301 (11th Cir. 2008) (affirming decertification of an FLSA collective action, dismissal of the opt-in plaintiffs, and severance of named plaintiffs into multiple individual actions).

**III. Analysis**

No comprehensive criteria guide the similarly situated inquiry. <u>O'Brien</u>, 575 F.3d at 585. However, at the second stage, courts generally consider (1) the plaintiffs' disparate factual and employment settings, (2) the likely defenses that appear to be individual to each plaintiff, and (3) the degree of fairness and the procedural impact of resolving the claims collectively. <u>Id.</u> Considering these factors, Frye has failed to meet his burden to continue this collective action, making decertification appropriate.[6]

---

[6] Because the Court grants Defendant's Motion to Decertify on these grounds, it need not address Baptist's argument that <u>O'Brien</u>, 575 F.3d at 586, mandates decertification if some plaintiffs <u>fail</u> to allege the purported FLSA violations. (<u>See</u> Mem. of Law and Facts in Support of Def.'s Mot. to Decertify Collective Action 12-34, ECF No. 339-1.)

### A. Factual and Employment Settings

Under the first factor, courts examine the plaintiffs' factual and employment settings, considering issues such as location, job duties, supervision, and salary. Wilks, 2006 WL 2821700, at *3.

Although the Plaintiffs in this case were all Baptist employees, they worked at three different Baptist-run hospitals. (See Wolfe Decl. ¶ 5.) Each Plaintiff worked in one of the approximately 200 departments that, as of January 8, 2010, comprised these three facilities. (See Barbaree Decl. 10 (noting BMH-Memphis had approximately 105 departments); Ingram Decl. ¶ 9, ECF No. 340-3 (noting BMHW had approximately 50 departments); Johnson Decl. ¶ 9, ECF No. 340-4 (noting BMH-Collierville had approximately 47 departments).)

Plaintiffs' job duties varied significantly, depending on their departments. Like Frye, some Plaintiffs worked in specialized medical departments, focusing on patient care. (See, e.g., Harris Dep. 16:17-17:5, Feb. 25, 2009, ECF No. 342-5 (describing duties as a patient care assistant in cardiac unit).) In contrast, others worked in supporting departments. (See, e.g., Wilkerson Dep. 7:13-9:8, Mar. 12, 2009, ECF No. 342-6 (describing housekeeping duties in food and nutrition department).)

Even within a single department, job duties varied. For example, in departments focused on patient care, such as intensive care units, staff nurses directly interacted with patients. (See, e.g., Neal Dep. 17:7-25, Sept. 16, 2009, ECF No. 342-7 (explaining that staff nurses dressed patients, administered medicines, and monitored responses and therapies). Administrative unit coordinators working in the same departments facilitated patient care, but did not directly interact with patients. (See, e.g., DeMoss Dep. 15:23-16:25, Sept. 10, 2009, ECF No. 342-8 (explaining that unit coordinators prepared patient charts, ordered laboratory tests, and provided administrative support to unit nurses).)

Baptist had a system-wide human resources director. (Wolfe Decl. ¶ 6.) However, each hospital maintained "its own finance and human resources functions." (Id.) During the period in question, each hospital was independently responsible for implementing a time reporting mechanism and keeping FLSA records. (Id. ¶¶ 6-7.)

As a result of this decentralization, employees used various procedures to ensure they were compensated for time worked during meal breaks. At BMH-Memphis, many departments used "exception logs" -- paper records on which employees recorded, among other things, time worked during meal breaks. (Barbaree Decl. ¶ 7.) However, employees in several BMH-Memphis

10

departments simply notified their supervisors when they worked through lunch. (See, e.g., Peterson Decl. ¶ 10, ECF No. 124-45 (noting that he would simply tell his supervisor); Brown Decl. 2, ECF No. 118-38 (explaining that she would write "no lunch" on a sheet of paper).) Like the departments at BMH-Memphis, most, but not all, departments at BMH-Collierville and BMHW maintained exception logs for employees to note time worked during meal breaks. (See Ingram Decl. ¶ 5; Johnson Decl. ¶ 5.) Taken together, these facts show significant differences among the plaintiffs' factual and employment settings, many of which would determine how Baptist's meal break policy affected them.

Frye acknowledges these distinctions, but contends they are immaterial to the decertification question. (Pl.'s Resp. 31.) Frye emphasizes that all the Plaintiffs were "subject to the automatic deduction policy and the illegal implementation of that policy, making them all victims of Baptist's attempts to shift the responsibility of ensuring they are paid properly to the employees themselves." (Pl.'s Resp. 31.) According to Frye, this commonality makes the Plaintiffs similarly situated.

Where plaintiffs' factual and employment settings differ, "a material factor in a court's consideration of the plaintiffs' factual and employment settings is whether they were all affected by a 'single decision, policy, or plan.'" Crawford, 2008 WL 2885230, at *4 (quoting Wilks, 2006 WL 2821700, at *3).

As the Sixth Circuit Court of Appeals has explained, "it is clear that plaintiffs are similarly situated when they suffer from a single, FLSA-violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs." O'Brien, 575 F.3d at 585. Showing such a "unified policy of violations" is not required. Id. However, "[t]he existence of this commonality may assuage concerns about plaintiffs' otherwise varied circumstances." Wilks, 2006 WL 2821700, at *3. Frye argues that "the opt-in [P]laintiffs . . . are all subject to Baptist's conscious decision to apply a less accurate time-keeping procedure -- the automatic deduction policy -- to their meal breaks." (Pl.'s Resp. 18.)

Standing alone, an employer policy providing automatic deductions for meal breaks does not violate the FLSA. See, e.g., Fengler v. Crouse Health Found., Inc., 595 F. Supp. 2d 189, 195 (N.D.N.Y 2009); see also Wage and Hour Div., U.S. Dep't of Labor Fact Sheet No. 53, The Health Care Industry and Hours Worked (July 2009), ECF No. 373-16 ("Dep't of Labor Fact Sheet") (recognizing that the FLSA permits automatic deduction policies). Therefore, Baptist's mere adoption of a system that, by default, deducts meal breaks from its employees' compensation does not constitute a unified policy of FLSA violations capable of binding the Plaintiffs together.

12

More importantly, where an employer's formal policy is to compensate employees for all time worked, courts generally require a showing that the employer's "common or uniform practice was to not follow its formal, written policy." Pacheco, 671 F. Supp. 2d at 959. As one court has explained, the lead plaintiff must show that the "enforcement of the automatic deduction policy created a policy-to-violate-the-policy." Saleen v. Waste Mgmt., Inc., No. 08-4959, 2009 U.S. Dist. LEXIS 49891, at *14 (D. Minn. June 15, 2009) (denying conditional certification where employees failed to show a corporate decision by employer not to follow its formal policy of paying for time worked during meal breaks).

Baptist's formal policy is to compensate employees for time worked during meal breaks. (See Barbaree Decl. ¶ 6; Ingram Decl. ¶ 4; Johnson Decl. ¶ 4.) Frye has introduced no direct evidence that Baptist has maintained a de facto policy to the contrary. Indeed, many of the employees deposed by Baptist admit that, when they used their departments' exception procedures, Baptist paid them for time worked during meal breaks. (See Def.'s Mot. to Decertify Collective Action Ex. 13, ECF No. 13 (collecting relevant excerpts from Plaintiffs' depositions).)

Frye has not proffered any circumstantial evidence that would permit the Court to infer any illicit de facto policy on

13

Baptist's part.   Most Plaintiffs deposed by Baptist admit that Baptist never discouraged them from or retaliated against them for reporting time worked during meal breaks.   (See Def.'s Mot. to Decertify Collective Action Ex. 14, ECF No. 341-2 (collecting relevant excerpts from Plaintiffs' depositions showing that 23 of the 39 deposed Plaintiffs made such admissions).)   Thus, Frye has failed to show a unified policy of violations at this stage of the proceeding.   See Crawford, 2008 WL 2885230, at *5 ("The plaintiffs must produce substantial evidence demonstrating that a central policy exists that binds the potential class members together.") (citations omitted).

Having failed to show a unified policy, Frye seeks to construct a common theory of FLSA violations.   Common theories of a defendant's FLSA violations may support a finding that plaintiffs are similarly situated, despite their disparate factual and employment settings.   See O'Brien, 575 F.3d at 585-86 (affirming decertification on other grounds).   "Even if the proofs . . . are inevitably individualized and distinct," where the plaintiffs allege "common theories of defendants' statutory violations," they are similarly situated.   Id. at 585.   In O'Brien, the plaintiffs showed they were similarly situated by "articulat[ing] two common means by which they were allegedly cheated: forcing employees to work off the clock and improperly editing time-sheets." Id. at 585-86.

14

According to Frye, Baptist's "implementation and application of its automatic deduction policy is an illegal shift of enforcement of the FLSA from itself to its employees . . . ." (Pl.'s Resp. 14.)   To support this "shifting the burden" theory, Frye emphasizes that all Plaintiffs must initiate some sort of action to receive payment for missed meal breaks.  (See id. at 14-17.)  Therefore, in Frye's view, Baptist has abdicated its FLSA duties.  (See id.)

Under the FLSA, management has a duty "to exercise its control and see that the work is not performed if it does not want it to be performed." 29 C.F.R. 785.13.  An employer "cannot sit back and accept the benefits [of work] without compensating for them." Id. ("The mere promulgation of a rule against such work is not enough. Management has the power to enforce the rule and must make every effort to do so.")   An employer's failure "to police and oversee hourly workers and their supervisors to ensure that[,] when working through or during unpaid meal breaks[,] they are compensated . . ." potentially violates the FLSA.  Fengler, F. Supp. 2d at 195; see also Dep't of Labor Factor sheet (explaining that an employer implementing an automatic deduction policy for meal breaks remains "responsible for ensuring that the employees take . . . meal break[s] without interruption").

15

At least two courts have conditionally certified collective actions based on "shifting the burden" theories similar to Frye's.  See Kuznyetsov v. W. Penn Allegheny Health Sys., No. 2:09-cv-00379-DWA, 2009 U.S. Dist. LEXIS 47163, at *14-15 (W.D. Pa. June 1, 2009); Camesi v. Univ. of Pittsburgh Med. Ctr., No. 09-85J, 2009 WL 1361265, at *4 (W.D. Pa. May 14, 2009).  The defendants in these cases were medical centers that required their hourly employees to initiate cancellation of their automatic deductions when they worked through meal breaks.  See Kuznyetsov, 2009 U.S. Dist. LEXIS 47163, at *12-13; Camesi, 2009 WL 1361265, at *1-2.  In both cases, however, the courts spoke at the lenient first stage of the similarly situated analysis, which they recognized in granting conditional certification. See Kuznyetsov, 2009 U.S. Dist. LEXIS 47163, at *14-15 ("Arguably, Defendants' policies shift the responsibility to the employees.  Consequently, I find this evidence is sufficient at this stage to proceed with conditional certification.") (emphasis added); Camesi, 2009 WL 1361265, at *4 (holding that the medical center's "arguable attempt to shift statutory responsibilities to [its] workers constitutes an 'employer policy' susceptible to challenge at this stage in the proceedings.") (emphasis added).

Frye's burden is significantly higher than the burden of the plaintiffs in the foregoing cases.  At the first stage, a

16

lead plaintiff need make only a "modest factual showing" that all plaintiffs are similarly situated. Comer, 454 F.3d at 546. At the second stage, the lead plaintiff must show that the opt-in plaintiffs are, "in fact," similarly situated. Id. at 547. To support a "shifting the burden" theory capable of binding the Plaintiffs together, Frye must introduce "substantial evidence" that Baptist, in fact, shirked its FLSA responsibilities. See Crawford, 2008 WL 2885230, at *5.

A natural consequence of any employer's adopting an automatic deduction policy is that employees will be required to cancel the deduction if they work through meal breaks. In this sense, any automatic deduction policy "shifts the burden" to employees. Because the FLSA permits automatic deduction policies, standing alone, this so-called "burden shift" cannot form the basis of an alleged FLSA violation. Therefore, Baptist's requiring its employees to take affirmative action to ensure payment for time worked during meal breaks, by itself, does not support a common theory of statutory violations capable of overcoming the Plaintiffs' otherwise disparate factual and employment settings.

Frye attempts to bolster his "shifting the burden" theory by contending that the Plaintiffs were all subject to Baptist's "inadequate education, training, and monitoring regarding its FLSA meal break policies . . . ." (Pl.'s Resp. 17-18.) Frye

17

describes Baptist's current education and training processes and
implies that they are inadequate. (See Pl.'s Resp. 3-8.) For
example, other than an initial new employee orientation, Baptist
provides no formal training on the exception procedures for non-
management employees. (Barbaree Dep. 16:20-17:18, Mar. 23,
2010, ECF No. 373-4; Ingram Dep. 24:7-9, Mar. 23, 2010; Johnson
Dep. 17:21-20:10, Mar. 23, 2010.) There is no systematic
training about the automatic deduction policy for management-
level employees, aside from an initial training program and
occasional managers meetings. (Johnson Dep. 41:19-41:21.)

Despite these supposed shortcomings, other evidence
contradicts Frye's argument that "there is no evidence that
employees leave orientation with a solid understanding of the
meal break policy." (Pl.'s Resp. 16). The vast majority of the
Plaintiffs deposed by Baptist stated that they were aware of
Baptist's procedures for reporting time worked during meal
breaks. (See Def.'s Mot. to Decertify Collective Action Ex. 13
(collecting relevant excerpts from Plaintiffs' depositions
showing that 33 of 39 deposed Plaintiffs were aware of Baptist's
exception procedures).) Many of the deposed Plaintiffs concede
that they used the exception procedures. (See id.) If
Baptist's education and training were, in fact, inadequate,
there would be substantial evidence that the Plaintiffs were
unaware of Baptist's policies.

18

Frye also describes Baptist's current monitoring process, implying that it is inadequate. (Pl.'s Resp. 8.)  For example, Baptist does not monitor managers' or employees' compliance with the meal break policy. (Johnson Dep. 50:13-51:6, Mar. 23, 2010).  Nor does Baptist audit the exception logs themselves, (Garrison Dep. 29:12-29:20), other than to ensure that the exceptions given are not "subjective," (Johnson Dep. 43:21-44:22).

These limited facts do not constitute "substantial evidence" that Baptist has abdicated its FLSA duties.  Where employees sometimes use procedures to report time worked but neglect to do so for all time worked, an employer has no reason to know of the unreported time.  Cf. Wood v. Mid-America Mgmt. Corp., 192 F. App'x. 378, 380 (6th Cir. 2006) (concluding that, because employee reported some overtime hours, employer "had no reason to suspect that he neglected to report other overtime hours").  Many of the employees deposed by Baptist admit that they sometimes used the exception procedures. (See Def.'s Mot. to Decertify Collective Action Ex. 13 (collecting relevant excerpts from Plaintiffs' depositions).)  They also admit that they sometimes voluntarily failed to report time worked during meal breaks. (See Def.'s Mot. to Decertify Collective Action Ex. 18, ECF No. 342-1 (collecting relevant excerpts from Plaintiffs' depositions showing that 19 of 39 deposed Plaintiffs

19

knew of, but failed to use, the exception procedures).) Thus, Baptist had no reason to know of uncompensated work occurring during meal breaks and no reason to conduct more significant monitoring or auditing. Cf. Wood, 192 F. App'x at 380 ("Quite sensibly, 'an employer cannot suffer or permit an employee to perform services about which the employer knows nothing.'") (quoting Holzapfel v. Town of Newburgh, 145 F.3d 516, 524 (2d Cir. 1998)).

If Baptist's monitoring were, in fact, inadequate, the Court would expect to see instances of non-payment by Baptist even when employees used the exception procedures. Aside from isolated incidents, which Baptist corrected promptly, (see, e.g., Nowley Dep. 45:12-46:12, Aug. 22, 2009, ECF No. 342-1), Frye has proffered no such evidence. Rather, many of the employees deposed by Baptist concede that, when they used the exception procedures, they received proper compensation. (See Def.'s Mot. to Decertify Collective Action Ex. 13 (collecting relevant excerpts from Plaintiffs' depositions).)

For these reasons, Frye's "shifting the burden" argument cannot form the basis of a common theory of FLSA violations that brings commonality to the otherwise differently situated Plaintiffs. Based on the foregoing, the differences among the Plaintiffs' factual and employment settings outweigh the

similarities.    Therefore,  the  first  factor  weighs  in  favor  of
decertification.

### B.   Individualized Defenses

A  second  relevant  factor  is  the  extent  to  which  the
defenses  appear  to  be  individual  to  each  plaintiff.   Wilks, 2006
WL 2821700,  at  *7.   The  presence  of  many  individualized  defenses
makes  a  representative  class  unmanageable,  and  "several  courts
have  granted  motions  for  decertification  on  this  basis."
Crawford,  2008  WL  2885230,  at  *9  (quoting  Moss  v.  Crawford  &
Co., 201 F.R.D. 398, 410 (W.D. Pa. 2000)).

Baptist  argues  that  its  defenses  are  "just  as  disparate  and
individual  as  the  facts  and  circumstances  of  the  putative
[P]laintiffs'  employment."    (See  Mem.  of  Law  and  Facts  in
Support  of  Def.'s  Mot.  to  Decertify  Collective  Action  42,  ECF
No. 339-1.)  According  to  Baptist,  it  would  be  forced  to  conduct
individualized  inquires  to  determine,  inter alia,  whether  each
Plaintiff  missed  meal  breaks,  knew  of  Baptist's  meal  break
policy,  and  made  use  of  the  exceptions  log  or  other  procedures
to  ensure  compensation  for  time  worked  during  meal  breaks.   (Id.
at  42-43,  47-49.)   Baptist  also  argues  that  it  would  raise
defenses  such  as  Plaintiffs'  bankruptcies,  conflicting
declarations,  and  the  statute  of  limitations.  (Id. at 43-47.)

Where  plaintiffs'  factual  and  employment  settings  are
similar,  these  defenses  do  not  necessarily  render  collective

treatment unmanageable. See Crawford, 2008 WL 2885230, at *10 (finding similar defenses "uniform and suitable for assertion against each plaintiff who testifies at trial"). However, unlike the Crawford plaintiffs, Frye has failed to produce the significant evidence of a unified policy or common theory of violations required by the first factor of the similarly situated analysis, see supra Section III.A. Therefore, although Baptist's likely defenses would not necessarily bar collective treatment, the second factor does not weigh against decertification in this case.

## C. Fairness and Manageability

To analyze the third factor, courts consider whether collective treatment comports with the purposes of the FLSA, which Congress intended to be "broadly remedial and humanitarian." Wilks, 2006 WL 2821700, at *8 (quoting Donovan v. Brandel, 736 F.2d 1114, 1116 (6th Cir. 1984)). Courts balance the reduced cost to individual plaintiffs and any increased judicial utility that might result from collective action against the potential detriment to the defendant and any possible judicial inefficiency. See id. (citing Hoffman-La Rouche, Inc. v. Sperling, 493 U.S. 165, 170 (1989)). As a remedial statute, the FLSA "must not be interpreted or applied in a narrow, grudging manner." Dunlop v. Carriage Carpet Co., 548 F.2d 139, 144 (6th Cir. 1977). However, "the remedial

22

nature of the FLSA, standing alone, does not justify allowing a
case to proceed collectively . . . ." <u>Falcon v. Starbucks Corp.</u>,
580 F. Supp. 2d 528, 541 (S.D. Tex. 2008).

According to Frye, decertifying this class would result in
a waste of judicial resources. (Pl.'s Resp. 36. ("The opt-in
[P]laintiffs have all been subject to the same policies and
practices by Baptist which have resulted in their not having
been paid for missed and interrupted meal breaks.").) Where
"plaintiffs' assertions about the defendant's purportedly
improper time-keeping and pay practices play a predominant role
in each of their claims," courts have concluded that
decertification "would waste more judicial time and resources
than trying their cases individually would preserve." <u>E.g.</u>,
<u>Wilks</u>, 2006 WL 2821700, at *8. Unlike the named plaintiffs in
<u>Wilks</u>, however, Frye has not shown substantial evidence of any
improper time-keeping and pay practices by Baptist. <u>Compare</u>
<u>id.</u>, at *10 (finding "substantial evidence" that the defendant's
<u>de facto</u> policies violated FLSA), <u>with</u> <u>supra</u> Section III.A.
Therefore, no waste of judicial resources would result by
requiring the Plaintiffs to proceed individually.

In this case, the Plaintiffs' disparate factual and
employment settings would present significant manageability
problems. <u>See</u> <u>Price</u>, No. 03-2686, slip op. at 10. Despite
Frye's claim that representative testimony could ensure the

23

collective action remains manageable, (Pl.'s Resp. 33), Frye provides no workable classification of the Plaintiffs and cites no testimony that could be considered representative. Given the Plaintiffs' disparate factual and employment settings, proceeding collectively would result in unfairness to Baptist and reduce judicial economy. Therefore, the third factor weighs in favor of decertification.

## IV. Conclusion

For the foregoing reasons, the Court concludes that Frye has failed to meet his burden of showing that this case should proceed collectively. Therefore, Defendant's Motion to Decertify Collective Action is GRANTED. As a result, the claims of all Plaintiffs other than named Plaintiff James Allen Frye are DISMISSED WITHOUT PREJUDICE.

So ordered this 27th day of September, 2010.


s/ Samuel H. Mays, Jr.
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE